**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| MARYKAY BOWEN,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | CASE NO. 1:21-cv-02206<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Marykay Bowen ("Plaintiff" or "Ms. Bowen") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned pursuant to the consent of the parties. (ECF Doc. 14.)   For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.　　Procedural History

Ms. Bowen filed her DIB application on July 18, 2014, alleging a disability onset date of May 2, 2011.  (Tr. 75, 207-08, 970.)  She later amended her alleged onset date to May 1, 2012.  (Tr. 970.)  Her date last insured was December 31, 2016.  (Tr. 973.)  Thus, the relevant period for her claim was May 2012 through December 2016.  (Tr. 971, 973.)  She asserted disability due to fibromyalgia, sciatica, bulging disc in lower back, arthritis in bilateral knees and hips, depression, and anxiety.  (Tr. 101, 106, 237.)  Her application was denied at the initial level (Tr.

101-04) and upon reconsideration (Tr. 106-08).  She then requested a hearing.  (Tr. 109-10.)  On January 24, 2017, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 40-74.)

The ALJ issued an unfavorable decision on February 17, 2017, finding Ms. Bowen had not been under a disability from May 1, 2012 through the date last insured.  (Tr. 16-39.)  Ms. Bowen requested review of the decision by the Appeals Council.  (Tr. 203-06.)  The Appeals Council denied her request for review on November 29, 2017.  (Tr. 1-7.)  Ms. Bowen filed an appeal in the United States District Court Northern District of Ohio in January 2018.  (Tr. 1207-33.)  On September 25, 2018, the district court granted the parties' joint motion for voluntary remand.  (Tr. 1230-34.)  The Appeals Council remanded the case to the ALJ on May 3, 2019 pursuant to the district court's order with instructions to: obtain evidence from a medical expert if necessary; further evaluate Ms. Bowen's fibromyalgia and symptoms; and give further consideration to Ms. Bowen's maximum residual functional capacity.  (Tr. 1236-40.)

The ALJ conducted a new hearing on May 3, 2020.  (Tr. 996-1020.)  The ALJ issued an unfavorable decision on March 17, 2020, finding Ms. Bowen had not been under a disability from May 1, 2012 through the date last insured.  (Tr. 967-95.)  Ms. Bowen filed exceptions to the ALJ's March 17, 2020 decision.  (Tr. 935-66, 1305-07, 1308-331.)  The Appeals Council did not assume jurisdiction, making the ALJ's March 17, 2020 decision the final decision of the Commissioner after remand.  (Tr. 927-34.)  Ms. Bowen filed her complaint seeking judicial review on November 19, 2021.  (ECF Doc. 1.)  The case has been fully briefed and is ready for review.  (ECF Docs. 8, 9 & 11.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Bowen was born in 1966.  (Tr. 207, 1002.)  She was fifty years old on the date last insured.  (Tr. 987.)  She has a high school education, with past work as fast-food manager.  (Tr. 47, 48, 987, 1002, 1003, 1010.)  She stopped working in 2011 due to her conditions and to take care of her father after her mother passed away.  (Tr. 48-49, 238.)

### B.    Medical Evidence

#### 1.    Treatment History

##### i.    Physical Impairments

Ms. Bowen's physical impairments during the relevant period included degenerative disc disease, osteoarthritis, fibromyalgia, and problems with her hips and knees.  (Tr. 973.)

A low back MRI was performed on June 6, 2011, prior to the alleged onset date, due to low back pain and sciatica.  (Tr. 453-54.)  The MRI showed: degenerative disc disease at the L4-5 and L5-S1 levels; moderate annular bulging at the L4-5 level, causing a mild degree of bilateral neural foraminal narrowing, but no central stenosis; and a small central disc protrusion indenting the dural sac at the L5-S1 level.  (Tr. 453.)

Ms. Bowen's treating rheumatologist was Margaret Tsai, M.D., with the Cleveland Clinic.  (Tr. 362.)  During a visit with Dr. Tsai on August 21, 2013, Ms. Bowen reported: all over pain, which she rated an eight out of ten; minimal morning stiffness; numbness and tingling in her hand while driving and in her feet after walking; and left-sided radiating back pain.  (*Id*.) She reported that she had been off Lyrica for months due to tiredness.  (*Id*.)  She reported no response with Mobic, but some response with Advil.  (*Id*.)  She ambulated well without assistance during the examination.  (Tr. 363.)  There was tenderness on palpation in her hands,

wrists, knees, and back.  (*Id*.)  There was no tenderness on palpation in the elbows, ankles, or hips.  (*Id*.)  She had full range of motion in her hands, shoulders, and knees, and fair range of motion in her wrists and hips.  (*Id*.)  There was no swelling, warmth, or erythema in her joints. (*Id*.)  She had normal pulses and reflexes and her strength was 5/5 with normal tone.  (*Id*.)  There were 10/18 tender points.  (*Id*.)  Ms. Bowen's diagnoses included fibromyalgia, Vitamin D deficiency, fatigue, multiple joint pain, osteoarthritis, back pain, and sciatica.  (Tr. 363-64.)  Dr. Tsai recommended that she restart Lyrica and Zanaflex and consult with physical therapy.  (Tr. 364.)  She advised Ms. Bowen to apply heat to the areas of pain and use an arthritis cream.  (*Id*.) She also recommended exercising thirty minutes, three times each week with weight-bearing aerobic exercises like walking, dancing, low impact aerobics, elliptical machine, stair climbing, and gardening; she recommended avoidance of high impact exercises like jumping, running, jogging, and twisting at the waist.  (*Id*.)  A lumbar x-ray ordered that day showed mild degenerative disc disease at the L5-S1 level.  (Tr. 298.)

Ms. Bowen attended physical therapy at the Cleveland Clinic for treatment of her sciatica.  (Tr. 299.)  She had attended seven physical therapy sessions as of September 30, 2013. (*Id*.)  At her session on September 30, 2013, she reported "minimal improvement since beginning physical therapy."  (*Id*.)  She reported bilateral lumbar spine pain, which she rated a 5/10.  (*Id*.)  She also reported left lower extremity pain to her ankle, which she described as aching and constant.  (*Id*.)

Ms. Bowen reported during a visit with Dr. Tsai on January 16, 2014 that she had minimal morning stiffness, but her neck pain was worse in the morning.  (Tr. 302.)  She also reported that her low back and left lower extremity pain was worse at night and when lying

4

down, and that she had numbness and tingling in her hand when on the computer and in her feet after sitting.  (*Id*.)  She had minimal improvement with physical therapy and medication.  (*Id*.)

Ms. Bowen presented to Girgis E. Girgis, D.O. at the Cleveland Clinic on February 12, 2014 for a pain management evaluation regarding her low back pain.  (Tr. 683.)  She said her pain was in her low back with radiation to the left lower extremity and tingling and numbness in her toes at times.  (*Id*.)  She described her pain as aching and shooting at times.  (*Id*.)  She rated her pain that day as a 4/10, with her worst pain being a 9/10 and her best pain being a 3/10.  (*Id*.)  Her pain was worse with standing and walking, and she said "nothing [made] [her] pain better."  (*Id*.)  She reported trying bilateral trigger point injections and physical therapy without relief.  (*Id*.)  On examination, she was alert and in no acute distress.  (Tr. 685.)  Range of motion in her neck was good.  (Tr. 686.)  There was mild tenderness over the bilateral lumbar facets and bilateral lumbar paraspinal muscles, but straight leg raise was negative bilaterally.  (*Id*.)  Her sensation was intact to light touch throughout and her deep tendon reflexes were normal.  (*Id*.)  Her motor strength and tone were 5/5 throughout except for slight weakness (4+/5) in the left hip flexors.  (*Id*.)  Her gait was normal.  (*Id*.)  Based on her history and examination, Dr. Girgis stated: "I am expecting L4 nerve root impingement whether from L3-4 or L4-5 disc herniation."  (*Id*.)  He indicated she would "benefit from right L3-4 and L4-5" epidural steroid injections and physical therapy.  (*Id*.)  He scheduled her for two injections and recommended that she start physical therapy after her first injection.  (Tr. 687.)  He also recommended that she consider switching from Effexor to Cymbalta.  (*Id*.)

When Ms. Bowen returned to Dr. Tsai on July 17, 2014, she reported more left knee and foot pain.  (Tr. 302.)  She was moodier with Effexor and felt she did better with Cymbalta.  (*Id*.)  She stopped Lyrica because she was too tired.  (*Id*.)  She was not taking Zanaflex.  (*Id*.)  She

reported a minimal response with use of Advil and Aleve.  (*Id*.)  Her husband was with her at the visit.  (Tr. 303.)  She was "very pleasant" and in "good spirits," but tired on examination.  (Tr. 303.)  She ambulated well without assistance.  (*Id*.)  She demonstrated tenderness on palpation in her hands, wrists, left foot, knees, and back, but no tenderness on palpation in the elbows or hips.  (Tr. 304.)  She had full range of motion in her hands, shoulders, and knees, and fair range of motion in her wrists and hips.  (*Id*.)  There was no swelling, warmth, or erythema in her joints.  (*Id*.)  She had normal pulses and reflexes and her strength was 5/5 with normal tone.  (*Id*.)  Dr. Tsai noted 11/18 tender points.  (*Id*.)  She prescribed duloxetine, Lyrica, and Mobic (*id*), and continued to recommend weight-bearing exercises, but avoidance of high impact exercise (Tr. 305).  Bilateral knee and foot x-rays were taken that day.  (Tr. 316-17.)  The knee x-rays showed patellofemoral disease.  (Tr. 316.)  The x-rays of her feet showed: mild hallux valgus bilaterally, greater on the left; mild degenerative changes of the first MTP joints on both sides; and bilateral Achilles and plantar calcaneal enthesophytes.  (Tr. 316-17.)

Ms. Bowen returned to Dr. Tsai on August 21, 2014.  (Tr. 392.)  She rated her pain zero out of ten that day and minimal morning stiffness.  (Tr. 393.)  She said Zanaflex made her too groggy and she was not taking Mobic.  (*Id*.)  Examination findings were similar to those recorded at her July 2014 appointment with Dr. Tsai.  (*Compare* Tr. 394 *with* Tr. 303-04.)  Dr. Tsai increased Lyrica and recommended that she restart Mobic and start Cymbalta.  (Tr. 395.)  She continued to recommend weight-bearing aerobic exercise with a goal of thirty minutes of exercise, three times each week.  (*Id*.)  She also continued to recommend arthritis cream and use of heat to help with the pain, and advised Ms. Bowen that she could take acetaminophen.  (*Id*.)

Ms. Bowen returned to Dr. Tsai on November 24, 2014.  (Tr. 413.)  She rated her back pain a five out of ten.  (*Id*.)  She reported minimal morning stiffness, but also said that nothing

helped her back pain.  (*Id*.)  She reported no numbness or tingling in her legs.  (*Id*.)  She reported stopping Lyrica a few weeks earlier because it caused drowsiness.  (*Id*.)  Dr. Tsai continued to recommend weight-bearing exercises and use of heat and arthritis cream to help with her pain. (Tr. 413, 416.)  Examination findings were similar to those recorded at her August 2014 appointment with Dr. Tsai.  (*Compare* Tr. 415 *with* Tr. 394.)  Dr. Tsai prescribed Cymbalta, Vitamin D, and Hydrocodone-Acetaminophen.  (Tr. 416.)  She also advised Ms. Bowen that she could restart Mobic and recommended a pain management consult.  (*Id*.)

Ms. Bowen continued to treat with her rheumatologist Dr. Tsai throughout 2015 and into 2016.  (Tr. 715-17.)  When she returned to Dr. Tsai on April 25, 2016, she reported bilateral leg and foot pain, which she rated a four out of ten.  (Tr. 715.)  She also reported swelling in her left ankle/foot, but said she had not yet seen a podiatrist.  (*Id*.)  She had minimal morning stiffness. (*Id*.) She was tired throughout the day and said Lyrica kept her awake.  (*Id*.)  However, she reported that she was doing okay overall and was happy with her care.  (*Id*.)  Examination findings were similar to past findings.  She was tired, but "very pleasant" and in "good spirits." (Tr. 718.)  She ambulated well without assistance.  (*Id*.)  She demonstrated tenderness on palpation in her hands, wrists, left foot, knees, and back, but no tenderness on palpation in the elbows or hips.  (Tr. 718-19.)  She demonstrated full range of motion in her hands, shoulders, and knees, and fair range of motion in her wrists and hips.  (*Id*.)  There was no swelling, warmth, or erythema in her joints.  (*Id*.)  She had normal pulses and reflexes and her strength was 5/5 with normal tone.  (Tr. 719.)  Dr. Tsai noted 12/18 tender points.  (*Id*.)  She ordered ankle and foot x-rays and podiatry and pain management consults.  (Tr. 720.)  Ms. Bowen's prescriptions included Adderall, Effexor XR, and Lyrica.  (*Id*.)  Dr. Tsai continued to recommend weight-

bearing exercises, but avoidance of high impact exercise.  (*Id*.)  She also recommended use of heat, arthritis creams, and Voltaren gel for pain.  (*Id*.)

Ms. Bowen returned to Dr. Girgis on May 9, 2016 for a pain management follow up regarding her bilateral knee pain.  (Tr. 690.)  Dr. Girgis noted tenderness over the bilateral thoracic paraspinal muscles over her back.  (Tr. 692.)  She demonstrated full range of motion in the bilateral knees, but with pain that was greater on the left than right with crepitus.  (*Id*.)  Ms. Bowen had an antalgic gait, but her deep tendon reflexes, motor strength, and sensation were normal throughout.  (Tr. 693.)  Dr. Girgis increased Ms. Bowen's Lyrica, ordered x-rays, and recommended physical therapy.  (*Id*.)  The knee x-rays showed marginal osteophytes and subchondral cysts in the patella and femoral trochleae involving apex/medial facet and medial trochlea bilaterally, medial and lateral compartment joint spaces were maintained.  (Tr. 698.)  The x-rays noted no joint effusion, acute fracture, dislocation, or chondrocalcinosis.  (*Id*.)

Ms. Bowen presented to podiatrist Christopher Herbert, DPM, at the Cleveland Clinic on June 10, 2016, complaining of chronic intermittent anterior left ankle pain that came and went.  (Tr. 599.)  Dr. Herbert assessed left ankle pain due to instability of the ankle with mild equinus and recommended a custom-molded foot orthotic.  (Tr. 600.)

Ms. Bowen returned to Dr. Girgis on August 1, 2016 regarding her left knee pain.  (Tr. 700-02.)  She described her knee pain as aching and constant, and estimated that her pain ranged from a three to eight out of ten.  (Tr. 700.)  She rated her pain at three that day.  (*Id*.)  She received a left knee steroid injection.  (*Id*.)

Ms. Bowen returned to Dr. Tsai on October 26, 2016.  (Tr. 707.)  She reported she was sleeping six hours with her CPAP machine, but was still tired.  (*Id*.)  She had shin splints after walking her dog, and had a lot of pain a day after standing in line at a store for thirty minutes.

(*Id*.)  She reported improvement in knee pain after her injection.  (*Id*.)  She was doing okay overall.  (*Id*.)  Examination findings were similar to those from her April 2016 appointment with Dr. Tsai.  (*Compare* Tr. 711 *with* Tr. 718-19.)

### ii.    Mental Health Impairments

Ms. Bowen's mental health impairments included major depressive disorder, anxiety, and attention deficit / attention hyperactivity disorder.  (Tr. 973.)

Ms. Bowen presented to Andrew Franko, M.D., at the Cleveland Clinic for a family health care visit on August 18, 2014.  (Tr. 385.)  Dr. Franko noted her history of fibromyalgia and depression.  (*Id*.)  Ms. Bowen reported that she was inactive and spent a lot of time watching television.  (*Id*.)  She walked her dog but said "not enough."  (*Id*.)  She said that she stopped taking her amphetamines because she did not think they helped.  (*Id*.)  She did not "really feel sad" and had no thoughts of self-harm, but did not want to do anything.  (*Id*.)  She reported that her husband was encouraging.  (*Id*.)  She was diagnosed with depression and fibromyalgia.  (*Id*.)  Dr. Franko counseled her on continuing her medication, staying active, and practicing good sleep hygiene.  (Tr. 385-86.)  He prescribed duloxetine for her depression and instructed her to continue with her fibromyalgia medication.  (*Id*.)

Ms. Bowen's depression was next discussed during a family health care visit with CNP Stacey Baumgartner at the Cleveland Clinic on October 27, 2014.  (Tr. 406-07.)  She was crying and explained that she had alternated between Effexor and Cymbalta; she was back on Effexor, but felt depressed and fatigued.  (Tr. 407.)  She reported that she had tried but failed with Zoloft and Paxil.  (*Id*.)  She agreed to search for a psychiatrist given her past failures on medication prescribed by her primary care provider.  (Tr. 407.)

Ms. Bowen presented to Kevin Nasky, D.O., at Psychological and Behavioral Consultants on December 10, 2014.  (Tr. 577-79.)  She reported a history of depression and ADHD.  (Tr. 577.)  She said her primary stressor was relational, explaining that she wanted to divorce her second husband but she was concerned about how it might impact their minor son. (*Id.*)  Her medications included Effexor XR 150 mg and Xanax .5 mg.  (*Id.*)  She reported that her mood was stable but she was feeling more agitated since increasing Effexor from 75 to 150 mg.  (*Id.*)  Sometimes Xanax helped and sometimes it did not.  (*Id.*)  She reported relief in the past with use of Adderall, but discontinued it when 10 mg was no longer effective and her primary care provider would not increase the dose.  (*Id.*)  She denied suicidal ideation.  (*Id.*)  She was well-groomed, calm, cooperative, attentive, and her eye contact was appropriate.  (Tr. 578.) She was oriented to person, place, time, and situation.  (*Id.*)  Her speech and thought content were normal.  (*Id.*)  Her affect was appropriate to content, constricted, and neutral.  (*Id.*)  Her mood was neutral and euthymic.  (*Id.*)  Her memory, insight, and judgment were good.  (*Id.*)  She was diagnosed with: major depressive affective disorder, recurrent episode severe degree without psychotic behavior; attention deficit disorder without hyperactivity; and anxiety state unspecified.  (*Id.*)  Dr. Nasky continued Ms. Bowen's prescriptions for Xanax and Effexor XR, but reduced the Effexor XR dose from 150 mg once a day to 75 mg twice a day with instructions to discontinue the evening dose if she did not tolerate it.  (*Id.*)  He also added Adderall.  (*Id.*)

Ms. Bowen had an initial psychiatric evaluation on January 14, 2015 with LISW Marcia Darby at Psychological and Behavioral Consultants.  (Tr. 509, 918-21.)  She reported that she left her husband and minor son in December 2013 for a boyfriend who she met online.  (Tr. 919.) She then left her boyfriend to return to her husband four times over the prior year, but was back living with her boyfriend since November 2014.  (*Id.*)  She said that she helped her boyfriend,

who was an addict attempting recovery.  (Tr. 919, 920.)  She described him as "hostile-dependent."  (Tr. 919.)  She also reported that her first husband, who she divorced in 2003, was an abusive addict.  (Tr. 919, 920.)  She described her second husband as a good provider, nice, and caring.  (Tr. 919.)  Her husband was willing to take her back, but she was unsure who she should live with.  (*Id*.)  She said her adult children and grandchildren were "family strengths." (*Id*.)  She was well-groomed with appropriate eye contact.  (Tr. 920.)  She was friendly, but tearful with a congruent affect and depressed mood.  (*Id*.)  Her speech was normal.  (*Id*.)  Her thought process was also normal, but her self-esteem was low.  (*Id*.)  She had good memory with average intelligence, but her insight was fair and her judgment was poor.  (*Id*.)  Ms. Bowen was diagnosed with major depressive affective disorder, recurrent episode moderate degree.  (Tr. 921.)  Individual therapy was recommended.  (*Id*.)

Ms. Bowen returned to Ms. Darby on January 28, 2015.  (Tr. 572.)  She reported that she felt "stronger."  (*Id*.)  She acknowledged that her situation with her boyfriend was chaotic and not necessarily the best for her, but she did not want to leave him.  (*Id*.)  She said she was looking for a job in retail.  (Tr. 573.)  Ms. Darby noted that Ms. Bowen was "struggling but working on better self-esteem."  (*Id*.)  She suggested to Ms. Bowen that she look for support, possibly through Alcoholics Anonymous.  (*Id*.)  Ms. Bowen also returned to Dr. Nasky on January 28, 2015 for medication refills.  (Tr. 568.)  There, she reported that her mood and ADHD symptoms were well-controlled on her medications, and that therapy with Ms. Darby was going well.  (*Id*.)

Ms. Bowen returned to Dr. Nasky on March 16, 2015.  (Tr. 568.)  She reported feeling more anxious and jittery.  (*Id*.)  She said she was having problems with her boyfriend and wanted to leave him to return to her husband, who was "'willing to wait' for her."  (*Id*.)  She was well-

groomed, calm, cooperative, and attentive with appropriate eye contact.  (Tr. 569.)  Her affect

was constricted and she was anxious, but her thought contact was normal with no evidence of

psychosis.  (*Id*.)  Her speech was normal and her memory, insight, and judgment were good.

(*Id*.)  Dr. Nasky continued her prescriptions for Adderall, Effexor XR, and Xanax, but increased

the Effexor XR to 150 mg once each day.  (*Id*.)  He also recommended that she continue with

individual counseling.  (*Id*.)

 Ms. Bowen continued to see Dr. Nasky for medication management in 2015.  (Tr. 533.)

In May 2015, she had no complaints other than feeling jittery and having problems concentrating

on Adderall.  (*Id*.)  In August 2015, she reported she was doing well with no complaints.  (*Id*.)

In November 2015, she felt that Effexor was not working because she had no energy.  (*Id*.)  In

December 2015, she reported that she could not tolerate the increased dose of Effexor because of

headaches and fatigue.  (*Id*.)  She said she was more tired.  (*Id*.)  She also felt that Adderall was

making her more anxious.  (*Id*.)  Her anxiety was her biggest complaint.  (*Id*.)

 Ms. Bowen also continued counseling with Ms. Darby in 2015.  (Tr. 882-915.)

Throughout most of 2015, Ms. Bowen struggled with making the decision to leave her boyfriend,

but ultimately returned to her husband and son.  (Tr. 892-915.)  After making the decision to

leave, she burst into tears during a counseling session with Ms. Darby on September 25, 2015.

(Tr. 892.)  She reported feeling guilty about leaving her boyfriend, but felt that she was in a

"hostage" living situation.  (*Id*.)  She reported that her husband and son were happy that she was

home.  (*Id*.)  They were planning on going camping that weekend.  (*Id*.)  After making the

decision to leave her boyfriend, Ms. Bowen continued to report difficulties and stresses related to

her relationships with her husband and boyfriend.  (Tr. 882-91.)  She also expressed concern

regarding her adult son's behavior.  (Tr. 885.)  In October 2015, Ms. Bowen looked more relaxed

and calmer.  (Tr. 889.)  She was not tearful and appeared to be progressing with her self-esteem.

(*Id*.)  In November 2015, she reported that her minor son was happy and doing well and she

really enjoyed taking care of her one-year-old granddaughter.  (*Id*.)

Ms. Bowen reported to Dr. Nasky on January 12, 2016 that she was "doing okay."  (Tr.

533.)  She was less tired after she stopped taking her fibromyalgia medication at night, and was

spending more time with her grandkids, using breathing exercises, taking Xanax once or twice a

day, and trying to minimize "toxic people" in her life.  (*Id*.)  Ms. Bowen reported to Ms. Darby

during a counseling session the following day that she was in pain with all of her physical

problems, and was looking into holistic medications.  (Tr. 879.)  She reported that she had a

good time with her kids over the holidays.  (*Id*.)   Her boyfriend was upsetting her; her husband

was being patient with her.  (*Id*.)

During a counseling session with Ms. Darby on March 4, 2016, Ms. Bowen reported that

her mind was clear on Effexor and she told her boyfriend she was "done."  (Tr. 876.)  When she

returned to Ms. Darby on March 25, 2016, she reported that she was unmotivated and depressed.

(Tr. 873.)  She expressed tearful regret over what she had done to her minor son over the last few

years.  (*Id*.)  She also reported going through some of her parents' belongings, which she

acknowledged could have contributed to her feeling depressed.  (*Id*.)  She was also adjusting to

living with her husband again.  (*Id*.)

When Ms. Bowen returned to Dr. Nasky on March 8, 2016, she reported feeling better as

far as her mood, and her depression had subsided.  (Tr. 532.)   Her affect was constricted and she

was depressed on examination, but was well-groomed, calm, cooperative, attentive with

appropriate eye contact, normal thought process, and good memory, insight, and judgment.  (Tr.

534.)  Dr. Nasky continued her prescriptions for Adderall, Effexor XR, and Xanax, and

recommended that she continue with individual counseling.  (*Id*.)  Effexor XR was continued at 187.5 mg once a day.  (*Id*.)

Ms. Bowen continued counseling with Ms. Darby.  (Tr. 865.)  When she met with Ms. Darby on May 11, 2016, she had her granddaughter with her.  (*Id*.)  She continued to report struggles separating from her boyfriend, but said she was done with him.  (*Id*.)  She expressed concern about her adult son's behavior.  (*Id*.)

Ms. Bowen returned to Dr. Nasky on June 7, 2016, reporting that her relational and interpersonal turmoil and situational anxiety persisted.  (Tr. 525.)  She reported that her appetite and energy were good.  (*Id*.)  Her mental status examination findings were similar to her prior findings.  (*Compare* Tr. 527 *with* Tr. 534.)  Ms. Bowen's medications were continued.  (Tr. 528.)

When she returned to Dr. Nasky on August 24, 2016, she reported that she did not think her medication was working.  (Tr. 767.)  She said she was always exhausted, had no motivation, could not concentrate, had low self-esteem, worried excessively, and had increased anxiety and crying spells.  (*Id*.)  But she was unable to identify a specific trigger for her symptoms.  (*Id*.)  Her mental examination findings were unchanged.  (*Compare* Tr. 770 *with* Tr. 527.)  Dr. Nasky continued her medications, but increased her Effexor XR.  (Tr. 770.)

When Ms. Bowen met with Ms. Darby on September 9, 2016, she reported having problems with buzzing in her ears, headaches, and fatigue.  (Tr. 849.)  She felt that her mind was racing at night.  (*Id*.)  She reported depression and anxiety, and concern over her adult son's behavior.  (*Id*.)  Ms. Bowen returned to Ms. Darby on September 29, 2016, reporting that she was tired due to fibromyalgia pain.  (Tr. 845.)  She reported problems sleeping and was worried about her adult son's behavior.  (*Id*.)  Her minor son was doing well in school.  (*Id*.)  Ms. Darby

14

encouraged her to exercise to help her sleep.  (*Id*.)  Ms. Bowen reported she was looking forward to camping.  (*Id*.)

Ms. Bowen's care was transferred from Dr. Nasky to Patti Rodgers, MSN, at Psychological and Behavioral Consultants on November 9, 2016.  (Tr. 760.)  Her mental examination findings were normal, except for a constricted affect.  (Tr. 762-63.)  Nurse Pracitioner Rodgers recommended that Ms. Bowen taper off Effexor XR due to reported ongoing mood and anxiety symptoms and problems tolerating the medication, and start another antidepressant.  (Tr. 763.)  She recommended that Ms. Bowen continue with counseling.  (*Id*.)

Ms. Bowen returned to Nurse Practitioner Rodgers on November 23, 2016.  (Tr. 754.) She reported doing much better since her Effexor XR was decreased and Prozac was added to address her complaints of feeling jittery and agitated.  (Tr. 755.)  Her mood was "fairly good and stable," and her "energy and motivation [had] improved about 50%."  (*Id*.)  She continued to have problems sleeping, but her attention and concentration were good.  (*Id*.)  Her mental status examination findings were unremarkable.  (*Id*.)  Nurse Practitioner Rodgers indicated that Ms. Bowen's response to her current regimen was good and her status was improving.  (Tr. 756.)

When Ms. Bowen met with Ms. Darby on November 30, 2016, she reported that she was exhausted after preparing a holiday meal for her family.  (Tr. 833.)  She was also angry with her adult children because they initially told her they could not come over for the holiday, but then showed up.  (*Id*.)  She expressed concern regarding her adult son's familial situation.  (*Id*.)  She said she hoped to take all of the kids to her husband's work for a Santa breakfast.  (*Id*.)

When Ms. Bowen returned to Nurse Practitioner Rodgers on December 16, 2016, she reported that her mood had been more erratic and she had ongoing psychosocial stressors.  (Tr. 748.)  Nurse Practitioner Rodgers encouraged Ms. Bowen to set appropriate boundaries with

situations and to try to distance herself from others' crises.  (*Id*.)  Her mental status examination

findings were normal.  (*Id*.)  Nurse Practitioner Rodgers advised Ms. Bowen to continue to taper

Effexor XR and started her on Cymbalta to better address her depressive and anxiety symptoms.

(Tr. 749.)  Nurse Practitioner Rodgers indicated that Ms. Bowen's status was worsening.  (*Id*.)

### 2. Opinion Evidence

#### i. Physical Impairment Opinion Evidence

##### a. State Agency Medical Consultants

State agency medical consultant Leanne M. Bertani, M.D., reviewed the record on

September 20, 2014 and assessed Ms. Bowen's physical residual functional capacity.  (Tr. 81-

82.)  She opined that Ms. Bowen could: occasionally lift and/or carry twenty pounds; frequently

lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit

about six hours in an eight-hour workday; frequently push and/or pull with the bilateral lower

extremities; frequently balance and stoop; and occasionally kneel, crouch, crawl, climb

ramps/stairs, and climb ladders/ropes/scaffolds.  (*Id*.)

State agency medical consultant James Cacchillo, D.O., reviewed the record on March

28, 2015.  (Tr. 95-97.)  He affirmed Dr. Bertani's residual functional capacity findings.  (*Id*.)

##### b. Physical Capacity Evaluation

James McDonald, a physical therapist with the Cleveland Clinic's Rehabilitation and

Sports Therapy department conducted a physical capacity evaluation on November 2, 2016.  (Tr.

608-12.)  Mr. McDonald stated that the purpose of the evaluation was to "[a]ssist physician in

making recommendations regarding [Ms. Bowen's] application for disability."  (Tr. 608.)  Mr.

McDonald provided a "summary cover letter," which stated that Ms. Bowen put forth full effort during the evaluation.[1]  (*Id.*)

Based on results of his evaluation, Mr. McDonald opined that Ms. Bowen was able to perform light work with occasional lifting below waist height to twenty pounds, lifting fifteen pounds to shoulder height, and carrying fifteen pounds.  (Tr. 609.)  She could pull twenty-two pounds and push seventeen pounds.  (*Id.*)  She could occasionally balance, bend, squat, and perform stair climbing and walking, fine coordination, firm grasping, and pinching.  (*Id.*)  She could reach forward and perform gross coordination and simple grasping frequently.  (*Id.*)  She could sit for up to five hours and forty-four minutes and stand for up to two hours and thirty-six minutes during a workday.  (*Id.*)

### ii.    Mental Health Impairment Opinion Evidence

### a.    Treating Mental Health Providers

February 2015 – Dr. Nasky and Ms. Darby

Dr. Nasky completed a Mental Status Questionnaire on February 11, 2015.  (Tr. 510-12.) He reported seeing Ms. Bowen three times between December 10, 2014 and January 28, 2015 and treating her for major depressive disorder, anxiety disorder, and attention deficit hyperactivity disorder.  (Tr. 510, 511.)  Her medications included Adderall XR, Effexor XR, and Xanax and she attended counseling.  (Tr. 511.)  He described her mental status as follows: she was well-groomed and looked her stated age; her flow of conversation and speech were normal; her mood was euthymic; her affect was congruent; she had no anxiety complaints; she had no thinking disorders; and she was fully oriented in all spheres.  (Tr. 510.)  He stated that there was

---

[1] The summary states: "See scanned document tab for complete detailed report" (Tr. 608), but neither party cites to findings from a "complete detailed report" and the Court has not located additional records from Mr. McDonald's evaluation other than those cited by the parties.

no evidence of cognitive impairment or impaired judgment, and her insight was good.  (*Id*.)  Dr. Nasky opined that she had: no impairment in her ability to remember, understand, and follow directions; no impairment with treatment in her ability to maintain attention and sustain concentration, persist at tasks, and complete tasks in a timely manner; and no identified deficiencies in social interaction and adaption.  (Tr. 511.)  With continued medication management, Dr. Nasky did not anticipate that Ms. Bowen would have impairment in responding to pressure in work settings or elsewhere involving simple, routine, or repetitive tasks.  (*Id*.)

Ms. Darby also completed a Daily Activities Questionnaire on February 11, 2015, after having seen Ms. Bowen for a month.  (Tr. 508-09.)   She reported that Ms. Bowen did not talk with her brothers and did not visit with friends, but got along with and spent time with her own children.  (Tr. 508.)  She stated that Ms. Bowen got along "really good" with individuals that she worked with in the past.  (*Id*.)  She stated that Ms. Bowen could not stand, walk, or lift for any length of time and had a "high need for rest due to fibromyalgia [and] arthritis."  (*Id*.)  She stated that Ms. Bowen could prepare food, tend to her personal hygiene, drive, and take care of her bills.  (Tr. 509.)  She said she had some limitations with performing household chores due to stairs and she had some trouble shopping due to walking.  (*Id*.)  Ms. Bowen's hobbies included crafts.  (*Id*.)  Ms. Darby stated that Ms. Bowen was reliable in keeping her appointments and she was compliant with her medication.  (*Id*.)

August 2015 – Ms. Darby / Dr. Nasky

Ms. Darby completed a Medical Source Statement - Mental on August 12, 2015.  (Tr. 520-22.)  The statement was co-signed by Dr. Nasky.  (Tr. 522.)  The statement indicated that Ms. Bowen's diagnoses included major depressive disorder, attention deficit without hyperactivity, and anxiety state unspecified; she was prescribed Xanax, Adderall XR, and

Effexor XR.  (Tr. 520.)  The statement identified the following symptoms: depressed mood, no interest in activities, insomnia, agitation, fatigue, feelings of worthlessness, worry, anxiety, and inattention. (*Id*.)  A check box described Ms. Bowen's capacity for competitive employment as: "Symptoms will interfere to the extent that the patient is unable to maintain persistence and pace to engage in competitive employment."  (*Id*.)  Additional check boxes indicated that she had moderate limitations in her ability to perform activities of daily living, marked limitations in her ability to maintain social functioning and maintain concentration, persistence, or pace, and no had episodes of decompensation.  (Tr. 520-21.)

The statement further indicated that:

- medical documentation showed that Ms. Bowen had a chronic disorder of at least two years' duration which had caused more than a minimal impairment in her ability to do basic work activities;

- Ms. Bowen had a documented current history of at least one year of inability to function outside a highly supportive living situation; and

- even a minimal increase in mental demands or change would cause Ms. Bowen to decompensate.

(*Id*.)  The statement also indicated that Ms. Bowen's psychologically based symptoms would likely cause her miss work more than four times per month.  (*Id*.)

<u>January 2017 – Ms. Darby</u>

Ms. Darby completed a Mental Impairment Questionnaire on January 20, 2017.  (Tr. 921-26.)  She stated that Ms. Bowen had been diagnosed with major depressive disorder, she received treatment bi-weekly, and her depression exacerbated her fibromyalgia.  (Tr. 923, 925.)  She opined that Ms. Bowen was markedly limited in her activities of daily living and in her ability to maintain concentration, persistence, or pace.  (Tr. 925.)  She also opined that Ms. Bowen was

moderately limited in her ability to maintain social functioning.  (*Id.*)  She stated there were no episodes of decompensation.  (*Id.*)

Ms. Darby opined that Ms. Bowen had an affective disorder of at least two years' duration that caused more than a minimal limitation in her ability to perform basic work activity, resulting in such marginal adjustment that even a minimal increase in mental demands or change in the environment would cause her to decompensate.  (Tr. 925-26.)  She opined that Ms. Bowen would be off-task 25% or more of the time in a workday, and she would be absent from work more than four days per month.  (Tr. 926.)  She opined that Ms. Bowen was incapable of even "low stress" work.  (*Id.*)

<u>January 2020 – CNP Miller</u>

Brittany Miller, CNP, of Advanced Recovery Concepts completed a Mental Impairment Questionnaire on January 16, 2020.  (Tr. 1842-47.)  CNP Miller stated that Ms. Bowen was diagnosed with bipolar II disorder and was prescribed Latuda and Xanax as needed for anxiety/panic.  (Tr. 1843.)  CNP Miller stated that she relied on Ms. Bowen's report of symptoms to assess the severity of her mental impairment and symptoms as set forth in the questionnaire.  (Tr. 1844.)

Based on Ms. Bowen's report of symptoms, CNP Miller opined Ms. Bowen was markedly limited in her ability to interact with others, and moderately limited in her ability to: understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 1846.)   CNP Miller also opined that Ms. Bowen did not have "minimal capacity to adapt to changes in [her] environment or to demands that [were] not already part of [her] daily life."  (*Id.*)  She opined that Ms. Bowen would be off-task 25% or more of the time in a workday, and she would be absent from work about four days per month if she attempted to

work.  (Tr. 1847.)  She opined that Ms. Bowen was incapable of even "low stress" work.  (*Id*.)
CNP Miller opined that Ms. Bowen's fibromyalgia was also a factor in her inability to work at a
regular job on a sustained basis.  (*Id*.)

### b.     State Agency Psychological Consultants

State agency psychological consultant Cindy Matyi, Ph.D., reviewed the record on
October 29, 2014, considered Ms. Bowen's allegations and the medical evidence regarding her
depression and anxiety, and found she had no severe psychological impairment.  (Tr. 79-80.)

State agency psychological consultant Robyn Murry-Hoffman, Ph.D., reviewed the
record on reconsideration on February 25, 2015, which included evidence that Ms. Bowen had
started mental health treatment.  (Tr. 92-94.)  She affirmed Dr. Matyi's findings, opining that
Ms. Bowen did not have a severe psychological impairment.  (Tr. 93.)

### c.     Consultative Examiner

Ms. Bowen presented to psychologist Charlies Loomis, M.Ed., for a consultative
psychological evaluation on October 14, 2014.  (Tr. 370-77.)  She reported that her primary
barrier to employment was her physical impairments, noting that she could not stand or sit for
long, walk far, or lift a lot.  (Tr. 371.)  She was separated from her second husband, and living
with her boyfriend.  (*Id*.)  She had three children, two adult children and a nine-year old son who
was living with his father.  (*Id*.)  She reported that she got along well with others, including her
neighbors, supervisors, supervisees, and the general public.  (Tr. 372.)  She reported no inpatient
or outpatient mental health treatment, but was taking prescription medication for symptoms of
depression as prescribed by her family physician.  (*Id*.)  She said that her daily activities
included running errands, attending her son's school activities, going out to eat occasionally,

attending church, visiting with friends and family, using the computer to play games, listing to music, watching television, and walking her dog.  (*Id.*)

Ms. Bowen was pleasant and cooperative during the evaluation.  (Tr. 373.)  Her pace and persistence were adequate.  (*Id.*)  Her eye contact was limited.  (*Id.*)  She exhibited no problems with her speech or thinking.  (Tr. 373-74.)  Her affect was mostly appropriate, but she relayed some symptoms of depression.  (Tr. 373.)  There were no motor manifestations of anxiety present, but there were a few autonomic symptoms, including shortness of breath, nausea, and abdominal distress.  (*Id.*)  Her concentration, attention to task, immediate and delayed memory functions, and computational abilities were within average limits.  (Tr. 374.)  Her functional intelligence was estimated to be in the average range.  (*Id.*)

Ms. Bowen was diagnosed with unspecified depressive disorder.  (Tr. 375.)  Psychologist Loomis opined that Ms. Bowen did not have work-related functional limitations.  (Tr. 375-76.)

**C.  Plaintiff's Function Report and Hearing Testimony**

**1.  Function Report**

Ms. Bowen completed a Function Report on August 27, 2014.  (Tr. 244-51.)  She reported that she could not stand or sit for long time periods dues to sciatica, she had pain in her lower back and legs, and she had nerve pain in her hands and legs due to fibromyalgia.  (Tr. 244.)  She reported that she limited her activities and stayed in bed most of the day, but she also reported that she had a nine-year old son that she helped take care of.  (Tr. 245.)  She drove him to and from school, prepared him meals, and helped him with his homework.  (*Id.*)

Ms. Bowen reported that she cooked meals and was able to do some household chores, including laundry, dishes, and vacuuming.  (Tr. 246.)  However, she needed assistance carrying the laundry basket up and down the stairs.  (*Id.*)  It took her about thirty minutes to prepare

meals.  (*Id*.)  She shopped in stores twice a month for twenty to thirty minutes.  (Tr. 247.)  She

could drive.  (*Id*.)  Her hobbies included watching television, reading, and crafting.  (Tr. 248.)

During the day, she said she had to get up every twenty minutes to stretch her legs.  (*Id*.)  She

played games and talked to others a few times each week and she went to church and the library

once a week.  (*Id*.)

Ms. Bowen reported that she could lift five to ten pounds and could walk a half-mile

before needing to rest for five to ten minutes.  (Tr. 249.)  She said it was hard for her to bend,

squat, kneel, walk, sit, stand, lift, put on her socks and shoes, and sit down and get up from a

sitting position.  (Tr. 245, 249.)  She also reported having problems completing tasks and

concentrating; she would get "brain fog" and was forgetful.  (*Id*.)  She got along well with

authority figures, but did not handle stress or changes in routine well.  (Tr. 250.)

### 2. Hearing Testimony

#### i. Plaintiff's January 24, 2017 Hearing Testimony

At the January 24, 2017 hearing, Ms. Bowen testified in response to questioning by the

ALJ and her counsel.  (Tr. 46-68.)  She testified that she stopped working in 2011, after working

as a fast-food manager for close to twenty-five years, to take care of her father when her mother

passed away in March 2011.  (Tr. 48-49.)  Her father passed away that same year in December.

(Tr. 49.)  She said she did not go back to work after he passed away because she was under a lot

of stress and her legs and feet were really bothering her.  (*Id*.)

When asked why she felt she was disabled, Ms. Bowen said:

It's like everyday I go through anxiety, depression, chronic pain, not to the point
where you know I can't get up.  I can get up.  I can do simple tasks, but I have to
sit back down after awhile.

> If I'm standing doing dishes, I could stand there for probably like 10 minutes, 15 minutes, and it just feels like weight is bearing down on my legs.  My son helps me . . . .
>
> My son helps me empty the dishwasher, load the dishwasher, bring clothes down from the bathroom to the utility room.  Puts his own clothes away.  My husband helps me.  If I vacuum, I'll vacuum the living room, and I have to sit down.  I'm winded.  I'm short of breath.
>
> I have problems sleeping.  I did sleep studies.  So, I'm on a CPAP machine.  It's not helping at all because half the time I take it off in the middle of the night, and I don't even remember.  I can't take sleep medicine, because it just makes me more tired with my fatigue that I have.
>
> I'm constantly fatigued.  I mean I sit there, and it's like I can't concentrate.  It's like I want to do something, but I can't.  It's like in my mind I want to do it, but I can't get up and do it.  I told my psychiatrist and my therapist.

(Tr. 49-50.)  She said her problems were related to her ADD, depression, and anxiety.  (Tr. 50.) She said she also had memory problems, "fibro fog," and difficulty concentrating.  (Tr. 50, 56, 66-68.)  She said she was very grateful for her husband and son because they helped her whenever they could.  (Tr. 50-51, 61.)  She could cook if she did not have to stand for too long. (Tr. 51.)

Ms. Bowen testified that she had fibromyalgia pain daily in her lower back, left knee, ankles, elbows, hands, and occasionally in the left side of her neck.  (Tr. 56-57.)  She described her pain as achy.  (Tr. 57.)  Her pain was not constant, but she had it every day.  (*Id.*)  She rated her average pain level a seven or eight out of ten, with five being at the low end of her pain.  (Tr. 57-58.)  If she overexerted herself, she said she could hardly move the following day.  (Tr. 57.) She said an example of "overexerting" herself would be going out with her kids and doing a lot of walking and standing, like going to the IX Center.  (*Id.*)  She reported that she had more bad than good days as far as her pain.  (Tr. 58.)  The only thing that helped relieve her pain was sitting in her recliner and massage.  (*Id.*)

24

Ms. Bowen testified about her medications.  (Tr. 51-52.)  She was only taking Tylenol for her pain.  (Tr. 55.)  She tried Voltaren gel, Mobic, Lyrica, and Flexeril, and had a cortisone shot.  (Tr. 51, 55.)  She said she stopped taking Lyrica because it caused her to wake up feeling intoxicated.  (Tr. 51.)  She reported that the cortisone shot helped for about a week, but she had a bad reaction to it and it made her sleep for two days.  (Tr. 55, 63.)  She said Flexeril made her more fatigued to the point where she could not get up at all.  (Tr. 55.)  She said she usually slept on her couch because it reclined and there was a massager with heat built in.  (Tr. 55.)  She had tried physical therapy in the past, but she said it did not help.  (Tr. 53, 63.)  She reported taking Cymbalta, Xanax, and Adderall for her mental health conditions.  (Tr. 52-53.)  She said that she attended counseling twice a month.  (Tr. 53-54, 63-64.)

Ms. Bowen testified that she would walk about half an hour before she had to sit down.  (Tr. 54.)  She could stand about ten to fifteen minutes.  (*Id*.)  She did not use a cane.  (*Id*.)  She could sit for twenty minutes and had to constantly adjust her legs.  (*Id*.)  With respect to lifting, she said she could lift her three-month old granddaughter, who weighed between eight and ten pounds, but she did not think she could bend to pick her up from the floor or out of bed.  (*Id*.)  She reported that she could not kneel, squat, or use a ladder.  (Tr. 58-59.)  She could get up and down the stairs, but she had to go slow and hold on to a railing.  (*Id*.)  She reported gaining weight, which she said affected her both physically and emotionally.  (Tr. 65-66.)

On a typical day, Ms. Bowen would get her son ready for school and take him to school; her husband would take their son to school some days.  (Tr. 59.)  The school was thirty minutes from their home.  (*Id*.)  She would return home, watch television, and take a nap.  (*Id*.)  She generally did not feel rested in the mornings.  (Tr. 61.)  She said she stayed in her clothes for two to three days and showered only once or twice a week unless she had to go to an appointment or

somewhere for her son.  (Tr. 59-60.)  She reported that her physical impairments prevented her from performing activities that she once enjoyed, including gardening, camping, riding bikes, going to the park, spending time with her children, and just walking around the block.  (Tr. 64.) She said she was not involved in any clubs or organizations.  (Tr. 68.)  She and her husband went out to eat occasionally.  (*Id*.)  Otherwise, she did not do much socially.  (*Id*.)

### ii.    Plaintiff's March 3, 2020 Hearing Testimony

At the March 3, 2020 hearing, Ms. Bowen testified in response to questioning by the ALJ and her counsel.  (Tr. 1002-06.)  She testified that she felt that she was disabled during the period, ending in December 2016, because she could walk for only thirty minutes before her left foot and leg would start to hurt, she could sit for a half-hour to an hour with a break, and her depression and anxiety interfered with her ability to perform daily activities.  (Tr. 1003.)  She said it was "mainly . . . [her] legs and [her] feet" that were the problem.  (Tr. 1004.)

Ms. Bowen testified that her husband helped her a lot.  (Tr. 1004.)  She could make sandwiches and crockpot meals, but her husband usually did most of the cooking. (Tr. 1004.)  He also usually did the laundry.  (Tr. 1003.)  She could help fold clothes while sitting, but it would cause her back to hurt.  (*Id*.)  She could wash dishes for fifteen to twenty minutes before her back started to hurt due to sciatica.  (*Id*.)  She said that she could vacuum but had to vacuum one room at time and rest for thirty minutes afterward because it hurt her back and legs and caused her to get out breath.  (Tr. 1004.)

Ms. Bowen testified that sitting in a reclined position helped relieve her pain.  (Tr. 1005.) She used pain patches in 2015 and 2016 to help relieve her pain.  (*Id*.)  She reported that she started taking Lyrica at night about two weeks before the hearing and it was helping a lot.  (*Id*.)

**D.      Medical Expert's Testimony**

The ALJ called Allan Duby, M.D., to testify at the March 3, 2020 hearing as a medical expert. (Tr. 970, 1005-10.)  Dr. Duby testified that the evidence established that Ms. Bowen had the following impairments: fibromyalgia, osteoarthritis of the left knee, degenerative changes in her lumbar spine, and obstructive sleep apnea. (Tr. 1006-07.)  He opined that her impairments did not meet or medically equal a listing, but he would expect her impairments to cause the following functional limitations:

> She can lift up to 10 pounds frequently.  She can lift 11 to 20 pounds occasionally.  She can carry up to 10 pounds frequently.  She can carry 11 to 20 pounds occasionally.  She can sit for two hours at a time a total of six hours in a day.  She can bend[2] for one hour at a time a total of three hours in a day.  She can walk for one hour at a time a total of three hours in a day.  I would limit the combination of standing and walking in an eight hour day with total of five hours.  She can reach overhead, reach all other, push and pull frequently.  She can, with both hands.  She can handle both hands frequently.  She can finger with both hands frequently, feel with both hands continuously.  She can operate foot controls frequently.
>
> She can climb stairs, ramps occasionally, climb ladders or scaffolds occasionally, balance frequently, stoop occasionally, kneel occasionally, crouch occasionally.  I wouldn't have her crawl.  She can be exposed to unprotected heights frequently, moving mechanical parts frequently, operate a motor vehicle frequently, humidity and wetness frequently, dust, odors, fumes and pulmonary irritants frequently, extreme cold occasionally, extreme heat occasionally, vibrations occasionally and she has no noise limitations.

(Tr. 1007-08.)  Dr. Duby offered no opinion as to mental health impairments.  (Tr. 1008.)

Ms. Bowen's counsel directed Dr. Duby to the physical capacity evaluation conducted by Mr. McDonald at the Cleveland Clinic on November 2, 2016.  (Tr. 1009.)  He asked Dr. Duby what weight he gave or how he evaluated Mr. McDonald's finding that Ms. Bowen would only be able to stand for about two hours and thirty-six minutes in a workday when reaching his opinion that Ms. Bowen could stand or walk for up to five hours. (*Id.*)  Dr. Duby stated that he

---

[2] Dr. Duby may have been referring to Ms. Bowen's ability to stand not bend.  The use of "bend" rather than "stand" may also have been a transcription error.

based his opinion "upon documentation in the record." (*Id.*)  Counsel then asked Dr. Duby if

there was "anything specifically in the record that says [Ms. Bowen] could stand or walk up to

five hours." (*Id.*)  Dr. Duby responded:

> Counsel, if you look at what you're referring to on page three, in a way it's a little
> bit silly what the person wrote there, how did she come to two hours and 36 minutes,
> how did she come to five hours and 44 minutes, not 43 minutes or 58 minutes, so
> it's an opinion based on my training and years of experience but it's what is and is
> not documented in the record.

(*Id.*)

## E.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 1010-19.)  The VE classified

Ms. Bowen's past work as a fast-food services manager, a skilled, light exertional job.  (Tr.

1010.)  The ALJ asked the VE several different hypotheticals.  (Tr. 1011-14.)  In response to a

hypothetical that described an individual with the RFC ultimately assessed by the ALJ, the VE

testified that the described individual would not be able to perform Ms. Bowen's past work.  (Tr.

1012-14.)  But there were other jobs that the described individual could perform, including

cashier II, mail room clerk, and linen grader.  (Tr. 1014, 1017.)  The VE explained that the

cashier could sit all day and the mail room clerk and linen grader jobs would entail sitting for

about half the day and standing and walking for about half the day, so four hours of sitting and

four hours of standing and walking.  (Tr. 1016.)  The VE also explained that the jobs would be

available if the individual could only stand or walk for one hour at a time before needing to sit

back down.  (*Id.*)  The VE testified that a limitation to standing for a maximum of two hours and

thirty-six minutes would not preclude an individual from performing the cashier job.  (Tr. 1018.)

The VE testified that there would be no work available if an individual was off task 20%

or more of the time or would be absent two times per month on an ongoing basis.  (Tr. 1014-15.)

28

The VE testified that an acceptable rate of off-task behavior was less than 15%, and an acceptable rate of absenteeism was less than one day a month.  (Tr. 1015.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In his March 17, 2020 decision, the ALJ made the following findings:[3]

1.      The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.  (Tr. 973.)

2.      The claimant did not engage in substantial gainful activity during the period from her alleged amended onset date of May 1, 2012 through her date last insured of December 31, 2016.  (*Id*.)

3.      The claimant had the following severe impairments through the date last insured: degenerative disc disease of the lumbar spine, osteoarthritis, fibromyalgia, dysfunction of major joints (knees, hips), major depressive disorder, anxiety, and attention deficit disorder / attention deficit hyperactivity disorder.  (*Id*.)

4.      The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments through the date last insured.  (Tr. 973-75.)

5.      Through the date last insured, the claimant had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she could lift, carry, push, or pull 10 pounds frequently and 11-20 pounds occasionally; sit for 2 hours at a time and 6 hours out of 8; stand for 1 hour at a time, however, stand or walk for a total of 5 hours out of 8; occasionally reach overhead and frequently reach in other directions or push or pull with the bilateral upper extremities; frequently handle and finger bilaterally; frequently operate foot controls bilaterally; occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance;

---

[3] The ALJ's findings are summarized.

occasionally stoop, kneel, or crouch; no crawling; must avoid concentrated exposure to hazards such as unprotected heights, moving machinery, and commercial driving; must avoid concentrated exposure to humidity, wetness, fumes, odors, dust, gases, and poor ventilation; must avoid even moderate exposure to extreme cold, extreme heat, and vibration; can perform simple tasks in a routine work setting; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, and the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others. (Tr. 975-87.)

6.  The claimant was unable to perform any past relevant work through the date last insured. (Tr. 987.)

7.  The claimant was born in 1966 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date last insured. (*Id.*)

8.  The claimant has at least a high school education and is able to communicate in English. (*Id.*)

9.  Transferability of job skills is not material to the determination of disability. (*Id.*)

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. (Tr. 987-88.)

Based on the foregoing, the ALJ determined that Ms. Bowen had not been under a disability from May 1, 2012, the amended alleged onset date, through December 31, 2016, the date last insured. (Tr. 988.)

## V.  Plaintiff's Arguments

Ms. Bowen argues that the ALJ erred in his evaluation of the medical opinion evidence. (ECF Doc. 8, pp. 20-24; ECF Doc. 11, pp. 3-9.)  She also argues that the RFC is not supported by substantial evidence because the ALJ did not properly account for the limiting effects of her

fibromyalgia, degenerative disc disease, and osteoarthritis. (ECF Doc. 8, pp. 25-28; ECF Doc. 11, pp. 9-10.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B. First Assignment of Error: Whether the ALJ Erred in Evaluating the Medical Opinion Evidence

In her first assignment of error, Ms. Bowen argues the ALJ erred in his evaluation of the medical opinion evidence. (ECF Doc. 8, pp. 20-24; ECF Doc. 11, pp. 3-9.) More specifically, she contends that the ALJ should have assigned greater weight to the mental health opinions of Dr. Nasky and Ms. Darby and the physical functional capacity findings of Mr. McDonald, and that he erred by assigning greater weight to the opinions of medical expert Dr. Duby and the state agency medical consultants. (*Id.*) The Commissioner responds that the ALJ reasonably evaluated the medical opinion evidence. (ECF Doc. 9, pp. 17-22.)

### 1. Governing Legal Standards

Because Ms. Bowen filed her claim before May 27, 2017, the rules for evaluation of opinion evidence at that time are applicable. The regulations establish a hierarchy for evaluating

medical opinions in which the well-supported opinion of a treating physician is entitled to controlling weight, *see* 20 C.F.R. § 416.927(c)(2), and the opinion of an examining but non-treating medical source is given more weight than a non-examining medical source, *see* 20 C.F.R. § 416.927(c)(1).

The Sixth Circuit has provided detailed instructions regarding the weight to be given the opinion of a treating source:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

> If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). While the regulations do require an ALJ to consider the factors set forth in 20 C.F.R. § 404.1527(c)(2) in determining the weight to give a treating source opinion, they do not require a factor-by-factor analysis, only that the decision include good reasons for the weight assigned. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011).

"In evaluating the opinion of an examining but nontreating physician, 'the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that

the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty.'" *Beery v. Comm'r of Soc. Sec.*, 819 F. App'x 405, 408 (6th Cir. 2020) (quoting *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d))).

In cases where there is no treating source opinion, an ALJ must "evaluate all medical opinions" using the factors set forth in 20 C.F.R. § 404.1527(c), including: length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairments. *Walton v. Comm'r of Soc. Sec.*, No. 97–2030, 1999 WL 506979, at *2 (6th Cir. June 7, 1999). Medical opinions are "statements from acceptable medical sources," 20 C.F.R. § 404.1527(a)(1), which include licensed physicians (medical or osteopathic doctor) and licensed psychologists, 20 C.F.R. 404.1502(a). Under the applicable regulations, neither a physical therapist, a licensed social worker, nor a licensed nurse practitioner is an acceptable medical source. *See* 20 C.F.R. § 404.1502.

Nevertheless, the Social Security Administration has emphasized that opinions from "medical sources, who are not technically deemed 'acceptable medical sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 71 Fed. Reg. 45593, 45595 (August 9, 2006) (rescinded for claims filed on or after March 27, 2017, *see* 82 Fed. Reg. 15263 (March 27, 2017).) Thus, "an opinion from a medical source who is not an acceptable medical source . . . may outweigh the medical opinion of an acceptable medical source." 20 C.F.R. § 404.1527(f). The same factors used in evaluating opinions by acceptable medical sources remain relevant to such opinions, as the factors in 20 C.F.R § 404.1527 "represent basic principles that apply to the

35

consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources.'"  SSR 06-03p, 71 Fed. Reg. at 45595.

## 2.    ALJ's Evaluation of Mental Health Opinions

Ms. Bowen challenges the weight given to the opinions of Dr. Nasky and Ms. Darby, who treated her mental health impairments.  (ECF Doc. 8, pp. 22-23, 24; ECF Doc. 11, pp. 4-5, 7-9.)   As an initial matter, the Court observes that Ms. Darby is not an acceptable medical source.  Thus, her opinion was not entitled to "treating physician" deference under the operative regulations.  Even so, the ALJ clearly considered her opinions along with Dr. Nasky's opinions and provided reasons for the weight assigned to those opinions.

Following a detailed discussion of Ms. Bowen's mental health treatment history, including her treatment with Dr. Nasky and Ms. Darby (Tr. 979-82, 983-84), the ALJ assigned little and/or some weight to the February 2015 and August 2015 opinions of Dr. Nasky and Ms. Darby.  (Tr. 985-86.)  With respect to the February 2015 opinions, the ALJ explained:

> On February 11, 2015, Ms. Darby and Dr. Nasky completed forms about the claimant [].  Ms. Darby reported that "during attempts to return to work," the claimant could not stand/walk, lift, for any length of time; and the claimant had a "high need" for rest due to fibromyalgia and arthritis [].
>
> The undersigned gives little weight to Ms. Darby's input because the claimant last worked in May 2011 and she did not attempt to return to work through her date last insured. Furthermore, her input about a "high need" for rest due to fibromyalgia and arthritis is more appropriate for Dr. Tsai to opine about, not Ms. Darby.
>
> Dr. Nasky opined that the claimant had "no impairment" in the following areas provided the claimant continued with treatment including medication management: remember, understand, and follow directions; maintain attention; sustain concentration, persist at tasks, and complete them in a timely fashion; social interaction; adaptation; and react to the pressures, in work settings or elsewhere, involved in simple and routine, or repetitive, tasks [].
>
> The undersigned gives some weight to Dr. Nasky's opinion because it is consistent with his mental status examinations of the claimant already outlined above. However, giving adequate consideration to the claimant's subjective complaints

36

and giving some credit to Ms. Darcy's [*sic*] input, the undersigned finds some limitations.

(Tr. 985 (citations omitted).)  Ms. Bowen does not set forth a direct, developed, or clearly articulated challenge to the ALJ's weighing of the February 2015 opinions of Dr. Nasky and Ms. Darby.  Any challenge to the weighing of the February 2015 opinions is accordingly deemed waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997).  The Court finds no error in the weight given to the February 2015 opinions.

With respect to the August 2015 and January 2017 opinions, the ALJ explained:

On August 12, 2015, Ms. Darby completed a form about the claimant's mental capabilities. The form was co-signed by Dr. Nasky. They opined that the claimant's symptoms would interfere to the extent that the claimant is unable to maintain persistence and pace to engage in competitive employment; her symptoms "markedly" impair her social functioning and her concentration, persistence, or pace; the claimant has a chronic disorder of at least two years' duration which has caused more than a minimal impairment of the ability to do basic work activities; the claimant has a documented current history of at least one year of inability to function outside of a highly supportive living situation; and the claimant would likely miss work due to symptoms more than 4 times per month [].

The undersigned gives little weight to this opinion because it is highly inconsistent with their opinions rendered on February 11, 2015; it is not supported by the mental status examinations or the course of treatment; and there is no evidence that the claimant had an inability to function or that she lived in a highly supportive living situation.

On January 20, 2017, Ms. Darby completed a form about the claimant's mental capabilities. Ms. Darby opined that the claimant had "moderate" difficulties in social functioning and had "marked" difficulties in concentration, persistence, or pace; the claimant would be-off task 25% or more of the workday even performing simple work tasks; she is incapable of even "low stress" work; and the claimant would likely miss work due to impairments or treatment more than 4 times per month [].

The undersigned gives little weight to this opinion because it is not supported by the mental status examinations or the limited course of treatment.

(Tr. 985-86 (emphasis added) (citations omitted).)

Ms. Bowen argues the ALJ should have assigned great, if not controlling, weight to the opinions that her "conditions cause her to be off-task or absent from work at an excessive rate," as these opinions are "consistent with the record as a whole." (ECF Doc. 11, pp. 4-5.)  She argues the ALJ's reasons for giving the opinions less weight are not sufficient or supported by the record because "Ms. Darby actually had an extensive course of treatment with [Ms. Bowen]" and because of "the long-standing treating relationship, consistency, and specialization" of Dr. Nasky and Ms. Darby.  (ECF Doc. 8, p. 23.)

The operative regulations do not require a factor-by-factor analysis, only that the decision include good reasons for the weight assigned.  *Francis*, 414 F. App'x at 804.  One recognized "good reason" for assigning less than controlling to a treating physician's opinion "is if a treating source's opinion is inconsistent with the rest of the evidence."  *Gipson v. Comm'r of Soc. Sec.,* No. 5:16-cv-1108, 2017 WL 3732009, at *8 (N.D. Ohio Aug. 30, 2017) (*citing Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993)).  The clear language in the above-quoted paragraph establishes that the ALJ considered relevant factors, including the supportability of the opinions and their consistency with the other evidence of record.

The ALJ's finding that the August 2015 opinions were in stark contrast to the same providers' opinions of only a few months earlier is supported by substantial evidence.  The record demonstrates that Dr. Nasky found <u>no</u> impairments in February 2015, in contrast to the extreme limitations in the opinion he co-signed in August 2015.  As to the ALJ's finding that the excessive rates of off-task behavior and absenteeism described in the opinions were not supported by mental status examinations or course of treatment, the ALJ's analysis of the evidence shows that his finding was supported by substantial evidence.  He explained:

> Despite an anxious and/or depressed mood at times, on examinations by Dr. Nasky and Ms. Rodgers, the claimant was consistently well groomed and her gait was

consistently normal; her attitude and behavior were consistently calm, cooperative, and attentive; her speech was normal; her thought process and content were consistently normal; her memory was consistently good; her insight was consistently good; and her judgment was consistently good []. However, the mental status examination by Ms. Darby in January 2015 shows that the claimant was well groomed; her attitude and behavior were friendly, but she was tearful; her speech was normal; her mood was depressed; her thought process and content were normal, but showed low selfesteem at times; her memory was good; her insight was fair; and her judgment was poor [].

(Tr. 983 (citations omitted).)  The ALJ also explained:

During the relevant timeframe, the claimant was not psychiatrically hospitalized and there were no Emergency Department visits for acute psychiatric symptoms. While the claimant received outpatient mental health services at Psychological & Behavioral Consultants on a regular basis, she did not require or receive frequent or intensive outpatient mental health services. Regarding the counseling notes from Ms. Darby, the contents of these notes show that the claimant struggled with interpersonal issues, psychosocial stressors, and situational anxiety particularly around the fact that she left her husband and their minor son, Eddie, to live with Greg, someone she met on Facebook . . . .

(*Id.*)  The ALJ acknowledged and considered Ms. Bowen's mental health treatment history, her interpersonal issues, psychosocial stressors, and situational anxiety, yet he found they did not result in work preclusive limitations and her mental examination findings and course of treatment did not support the extreme limitations set forth in the August 2015 and 2017 opinions. Ms. Bowen has not shown that this determination lacks the support of substantial evidence.

The ALJ also found no evidentiary support for the contention in the opinion co-signed by Dr. Nasky that Ms. Bowen "had an inability to function or that she lived in a highly supportive living situation."  (Tr. 986.)  Ms. Bowen fails to identify any evidence supporting this extreme opinion, and the record demonstrates that she was capable of functioning and did not require a highly supportive living situation.  Although her husband assisted her with chores, she took care of their minor son.  (Tr. 59, 245.)  She reported driving him to and from school, which was thirty minutes from their home, she prepared him meals, and she helped him with his homework.  (*Id.*)

She also reported that she tried to help her boyfriend who was attempting recovery.  (Tr. 919, 920.)  Additionally, as discussed by the ALJ:

> [D]uring part of the relevant timeframe, the claimant lived with her boyfriend and there is no indication that the boyfriend helped the claimant (in fact, she helped him) and there is no evidence that the claimant returned to live with her husband because the claimant needed him for the above mentioned tasks.  Furthermore, in November 2015, the claimant reported that she received great joy in "taking care" of her one-year-old granddaughter, Maggie, making no mention of her husband [].  On May 11, 2016, the claimant saw Ms. Darby and the claimant was accompanied by her granddaughter Maggie, and there is no mention that the claimant's husband was present [].

 (Tr. 986 (citations omitted).)  The Court finds the ALJ did not err in finding no evidence to support an opinion that Ms. Bowen was unable to function or required a highly supportive living situation.

Ms. Bowen also challenges the ALJ's finding that Ms. Darby's January 2017 opinion was entitled to little weight because of the limited course of treatment, arguing: "In fact, Ms. Darby actually had an extensive course of treatment with [Ms. Bowen]."  (ECF Doc. 8, p. 23.)  This argument mistakes the ALJ's findings.  The ALJ's observation that the opinion was not supported by the "limited course of treatment" was not a determination that Ms. Darby had only treated Ms. Bowen on limited basis.  Instead, as the ALJ discussed:

> During the relevant timeframe, the claimant was not psychiatrically hospitalized and there were no Emergency Department visits for acute psychiatric symptoms.  While the claimant received outpatient mental health services at Psychological & Behavioral Consultants on a regular basis, she did not require or receive frequent or intensive outpatient mental health services.

(Tr. 983.)  The record supports the ALJ's determination that Ms. Bowen's course of treatment was limited in nature.  (Tr. 986.)

Ms. Bowen also argues that the more extreme opinions of Dr. Nasky and Ms. Darby "were later corroborated in a 2020, report by Brittany Miller, APRN, who also opined that [Ms.

40

Bowen] would likely be absent from work for over four days per month, would be off-task in excess of twenty-five percent of a given workday, and was incapable of even low stress work opinion." (ECF Doc. 11, p. 4 (citing Tr. 1847).)  The Court finds this argument unavailing.  The ALJ considered the opinion and assigned it no weight "because Ms. Miller did not treat the claimant during the relevant timeframe and January 6, 2020 is well past the claimant's date last insured of December 31, 2016."  (Tr. 986.)   Ms. Bowen has not challenged the ALJ's weighing of this opinion, and the Court finds the ALJ's reasons properly explained and supported by the record.  The Court additionally observes that CNP Miller explained that she relied on Ms. Bowen's self-report of symptoms to assess the severity of her impairment.  (Tr. 1844.)

Based on the record and for the reasons explained herein, the Court finds that the ALJ sufficiently explained and provided good reasons to support his assignment of little and/or some weight to the opinions of Dr. Nasky and Ms. Darby, and the Court finds those reasons have the support of substantial evidence.

### 3.    ALJ's Evaluation of Physical Impairment Opinions

Ms. Bowen also challenges the weight given to the physical impairment opinions of Mr. McDonald, Dr. Duby, and the state agency medical consultants.  (ECF Doc. 8, pp. 23-24; ECF Doc. 11, pp. 5-9.)  She contends that the ALJ improperly elevated the opinions of Dr. Duby and the state agency medical consultants – who did not examine or treat her – over the opinion of examining physical therapist McDonald.  (ECF Doc. 8, p. 24.)

As an initial matter, it is noted that a physical therapist is not an acceptable medical source.  Further, Mr. McDonald's evaluation appears to have been based on a one-time examination, not a treating relationship.  (Tr. 608-12.)  Accordingly, his opinion was not entitled

to "treating physician" deference under the operative regulations. Nevertheless, the ALJ did consider the opinion and provide reasons for the weight assigned. He explained:

> On November 2, 2016, the claimant attended a physical capacity evaluation conducted by James McDonald, PT, DPT. Mr. McDonald determined that the claimant could perform within the light physical demand category of work. Mr. McDonald reported that the claimant was able to work full-time and perform sitting for up to 5 hours and 44 minutes and standing for up to 2 hours and 36 minutes throughout her workday [].

> The undersigned gives limited weight to this physical capacity evaluation because it only contains a "summary" of findings. Furthermore, the opinion that the claimant can only stand for up to 2 hours and 36 minutes in a workday is not consistent with any of the other opinion evidence [].

(Tr. 982 (citations omitted).)

Ms. Bowen argues that Mr. McDonald's opinion was "no more a summary than any other medical notation in the record." (ECF Doc. 8, p. 23.) She is apparently arguing that the other opinions in the record also lack the support of clinical examination findings. This is inaccurate. More importantly, Ms. Bowen does not argue, and cannot successfully argue, that the summary nature of a medical opinion is an improper basis for giving it less weight. Even when "evaluating the opinion of an examining but nontreating physician," the Sixth Circuit has emphasized that "'the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of [her] opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in [his] specialty.'" *Beery*, 819 F. App'x at 408 (emphasis added). Given that Mr. McDonald's physical functional capacity evaluation referenced but did not include a "complete detailed report," the ALJ properly discounted it as lacking adequate support for its conclusions.

Ms. Bowen also contends that Mr. McDonald's functional capacity assessment is "well-supported by the medical record, including objective testing and subjective complaints of [Ms.

Bowen]." (ECF Doc. 11, p. 5.) But the ALJ considered the objective testing in detail (Tr. 976-78, 979, 980-83) and explained:

> The undersigned finds that the <u>objective medical evidence, clinical findings on examination, and course of treatment in this case are not consistent with disabling physical impairment or disabling pain and are more consistent with the stated residual functional capacity</u>. As recounted above, an MRI and x-rays of the lumbar spine contained mild to moderate findings. On July 17, 2014, x-rays of the knees showed patellofemoral disease and x-rays of the feet showed no acute findings []. On May 9, 2016, x-rays of the knees showed "stable" patellofemoral osteoarthritis []. As outlined above, the claimant treated with Dr. Tsai on regular basis and on examinations by Dr. Tsai, the claimant was consistently alert, very pleasant, and in good spirits, but she also appeared tired. The examination of the claimant's hands, wrists, elbows, shoulders, knees, ankles/feet, hips, and back consistently showed tenderness to palpation except in the elbows and the claimant consistently had 11-12/18 tender points. However, the claimant consistently had "full" range of motion throughout except in the wrists and hips with "fair" range of motion, she ambulated "well" without assistance, and she had 5/5 (normal) strength. Dr. Tsai consistently recommended weight-bearing aerobic exercises and the claimant's primary care physicians also recommended regular aerobic exercise []. In September 2013, the claimant attended a short course of outpatient physical therapy for low back pain radiating to her left leg []. In June 2016, Dr. Herbert recommended a custom-molded functional foot orthotic for left ankle pain [] and in August 2016, the claimant saw Dr. Girgis for a left knee steroid injection with no complications and with instructions to follow up in six months []. <u>While the claimant received medical care on a regular basis, she did not require or receive frequent care for any medical condition. From all of this, the undersigned finds that the claimant's symptoms and limitations were not as severe as alleged.</u>

(Tr. 982-83 (emphasis added) (citations omitted).)

Ms. Bowen disagrees with the ALJ's weighing of Mr. McDonald's opinion, but there is no indication that the ALJ ignored the evidence Ms. Bowen points to as supporting the opinion. (ECF Doc. 11, p. 5.) The ALJ also did not ignore her subjective reports, stating:

> <u>The undersigned finds that the claimant was more active and more capable than alleged.</u> At a medical appointment on August 21, 2013, the claimant denied having difficulty performing or completing routine daily living activities[]. At medical appointments, despite reporting pain rated as high as 5/10 at times, the claimant consistently denied any serious difficulty concentrating, remembering, or making decisions; denied any serious difficulty with walking or climbing stairs; and she denied difficulty doing errands alone such as visiting a doctor's office or shopping (see July 17, 2014[]; August 12, 2014[]; August 18, 2014[]; October 27, 2014[];

November 24, 2014[]). In December 2014, the claimant told her primary care physician that she lived with her husband and their 10-year-old son. She reported that she cleaned and cooked[]. When the claimant was living with Greg, the claimant reported that she was tired of "being his mother"—she helped Greg with his medications, prescriptions, and health concerns; she helped around the home and she attended appointments with Greg[]. In November 2015, the claimant reported that she received great joy in taking care of her one-year-old granddaughter, Maggie[]. On May 11, 2016, the claimant saw Ms. Darby and the claimant was accompanied by her granddaughter Maggie[]. From all of this, the undersigned finds that the claimant's symptoms and limitations were not as severe as alleged.

(Tr. 984 (emphasis added) (citations omitted).)

The ALJ was permitted to rely on information articulated elsewhere in the decision to support his findings, and was not required to rearticulate that information in the opinion discussion. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). The Court finds the ALJ's consideration of the objective medical evidence and subjective reports was sufficiently explained, and that the weight given to Mr. McDonald's summary findings was supported by substantial evidence. Although Ms. Bowen disagrees with the ALJ's assignment of limited weight to Mr. McDonald's opinion, the Court's review of the decision as a whole and record evidence does not show that the ALJ's finding with respect to Mr. McDonald's opinion lacks the support of substantial evidence.

With respect to Dr. Duby's opinion, the ALJ explained:

At the hearing, Dr. Duby expressed the following opinion regarding the claimant's physical capabilities during an 8-hour workday: the claimant could lift/carry 10 pounds frequently and 20 pounds occasionally; sit for 2 hours at a time for a total of 6 hours; stand for 1 hour at a time for a total of 3 hours; walk for 1 hour at a time for a total of 3 hours; stand or walk for a total of 5 hours out of 8; frequently reach overhead and in other directions; frequently push/pull with the upper extremities; frequently handle, finger, and feel bilaterally; frequently operate foot controls bilaterally; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance; occasionally kneel and crouch; no crawling; frequent exposure to unprotected heights, moving machinery, and commercial driving; frequent

exposure to humidity, wetness, fumes, odors, dust, and pulmonary irritants; and occasional exposure to extreme cold, extreme heat, and vibration.

The undersigned gives <u>great weight to Dr. Duby's opinion because it is consistent with the imaging, clinical findings on examinations, and course of treatment, while giving adequate consideration to the claimant's subjective complaints including pain and fatigue</u>.

(*Id*. (emphasis added).)

Ms. Bowen argues that it was error for the ALJ to give great weight to Dr. Duby's opinion because Dr. Duby did not "point to a single citation that supported his opinion or assessment" and was "unprepared to discuss points in the record that contradicted his position, as he dismissed Mr. McDonald's physical capacity assessment as 'silly.'" (ECF Doc. 11, pp. 6-7.) In fact, Dr. Duby explained that he "review[ed] the file regarding Ms. Bowen's medical history and listened to the testimony" (Tr. 1006) and based his opinion on "what [was] and [was] not documented in the record" (Tr. 1009). He was charged with providing his medical opinion as to Ms. Bowen's functional limitations. It was then the ALJ's job to assess the appropriate weight for that opinion based on the relevant factors, including its supportability and consistency with the evidence of record. The ALJ did this and provided his reasons for the weight assigned.

Dr. Duby's comment that the physical functional capacity was "silly" does not distract from the consistency of his findings with the evidence of record. Dr. Duby's comment that the stated functional limitation was "silly" related to the fact that it was overly specific. He explained it was "a little bit silly . . . how did [he] come to two hours and 36 minutes, how did [he] come to five hours and 44 minutes, not 43 or 58 minutes[.]" (Tr. 1009.)

As explained above, the ALJ considered the entirety of the record, including the objective medical evidence, and concluded that Dr. Duby's findings were consistent with that evidence. The Court finds substantial evidence supports that determination, and because it is not a

reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, this Court cannot overturn the Commissioner's decision "so long as substantial evidence … supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

> With respect to the state agency medical consultants, the ALJ stated:

> As for the other opinion evidence, Leanne Bertani, M.D., and James Cacchillo, D.O., reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services, on September 20, 2014 and March 28, 2015, respectively. Both consultants expressed the opinion that the claimant retained the ability to perform light exertional work with some postural limitations and frequent push/pull with the lower extremities [].

> The undersigned <u>gives considerable weight to their opinion because it is generally supported by the imaging, clinical findings on examinations, and course of treatment. However, the undersigned does not give it great weight because they did not have the benefit of reviewing all the relevant medical evidence of record and they did not adequately consider the claimant's subjective complaints including pain and fatigue.</u>

(Tr. 984 (emphasis added) (citations omitted).)

Ms. Bowen's only clearly articulated argument with respect to the assignment of considerable weight to those opinions is that the state agency medical consultants "never personally examined [her], and also merely conducted a record review," like Dr. Duby.  (ECF Doc. 8, p. 24.)  However, it is not *per se* inappropriate for an ALJ to give more weight to the non-treating non-examining opinions of state agency consultants.  "In appropriate circumstances," the Sixth Circuit has held that "opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources." *Blakley*, 581 F.3d at 409 (quoting Soc. Sec. Rul. 96–6p).  "Where the non-examining source did not review a complete case record, [courts] require some indication that the ALJ at least considered these facts before giving greater weight to [that] opinion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (quoting *Blakley*, 581 F.3d at 409 (internal

quotations omitted)).  Here, the ALJ acknowledged that the state agency medical consultants did not have the benefit of reviewing all the medical records, and himself conducted a detailed analysis of the entire medical record through Ms. Bowen's date last insured.  Given these facts, the Court finds that Ms. Bowen has shown no error in the ALJ's consideration of and weighing of the state agency medical consultants' opinions.

For the reasons explained herein, the Court finds that the ALJ properly considered and evaluated the medical opinions regarding Ms. Bowen's mental and physical impairments. Further, the Court finds that the ALJ sufficiently explained his reasons and those reasons have the support of substantial evidence.  Ms. Bowen's first assignment of error is without merit.

## C.    Assignment of Error Two: Whether RFC is Supported by Substantial Evidence

In her second assignment of error, Ms. Bowen argues that the RFC lacks the support of substantial evidence because the ALJ "fail[ed] to account for the exertional limitations associated with extreme fatigue as a result of Mary Kay's fibromyalgia, arthritis, and time spent off-task and absenteeism as a result of pain and mental conditions."  (ECF Doc. 8, pp. 25-28; ECF Doc. 11, pp. 9-10.)

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 F. App'x at 157.

47

Ms. Bowen's argument is premised primarily on her claim that the ALJ did not give proper weight to the opinions of Mr. McDonald, Dr. Nasky, and Ms. Darby.  (ECF Doc. 8, pp. 26-28; ECF Doc. 11, pp. 9-10.)  For the reasons explained in Section VI.B., *supra*, the Court finds the ALJ's weighing of the opinion evidence was appropriate and had the support of substantial evidence.  The Court therefore will not readdress those arguments here.

Ms. Bowen also argues that the RFC lacks the support of substantial evidence because the ALJ did not properly assess her allegations of pain, specifically in regard to her fibromyalgia. (ECF Doc. 8, pp. 25-26, 27.)  She asserts that symptoms of fibromyalgia can wax and wane resulting in good and bad days, and that she "is in the best position to relay the limiting effects of pain" because pain is highly subjective.  (*Id*.)  She further argues that she "gave highly credible and consistent testimony, along with a consistent self-report regarding the limiting effects of her pain, giving her subjective testimony an objective basis for support"; and "she gave full effort at a physical capacity examination (Tr. 608-9), the results of which were consistent with her consistent description of how she is limited by pain."  (ECF Doc. 8, p. 27.)

A review of the ALJ's decision demonstrates that he did not ignore evidence regarding Ms. Bowen's fibromyalgia or reports of pain.   While Ms. Bowen argues that the evidence supports a more restrictive RFC, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Indeed, even if substantial evidence or a preponderance of the evidence were to support her position, reversal is not appropriate because "substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Ms. Bowen correctly observes that SSR 12-2p calls for "a longitudinal record" to be considered whenever possible when assessing an individual with an impairment of fibromyalgia

"because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days." *See* SSR 12-2p, 77 Fed. Reg. 43640, 43644 (Jul. 25, 2012).  And when the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Those factors include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  Here, the ALJ found fibromyalgia was a severe physical impairment (Tr. 973) and that the severe impairments could reasonably be expected to cause Ms. Bowen's alleged symptoms (Tr. 976).  The first step has thus been met, and the Court turns to consideration of the intensity and persistence of the alleged symptoms under the second step.

A review of the decision reveals that the ALJ considered Ms. Bowen's subjective allegations, including her alleged inability to sit, walk, or stand for long periods of time. (Tr. 976.)  He also considered the longitudinal record, including her ongoing treatment with her rheumatologist Dr. Tsai, noting that she was seeing Dr. Tsai as early as November 2011

49

regarding her fatigue (Tr. 977) and continued to follow with her through the end of 2016 (Tr. 981). He considered Dr. Tsai's examination findings, which regularly reflected that Ms. Bowen appeared tired but was very pleasant and in good spirits, and his continuing recommendation that Ms. Bowen should engage in weight-bearing aerobic exercise. (Tr. 977-81.) He considered findings which showed tenderness to palpation in joints and tender points, but also showed that Ms. Bowen ambulated well without assistance, had fair to full range of motion throughout with no swelling, warmth, or erythema, and normal strength. (*Id.*)

In addition to his detailed discussion of Ms. Bowen's treatment history with Dr. Tsai, the ALJ also considered treatment records and objective findings that included those of pain management specialist Dr. Girgis. (Tr. 981.)  He considered medications and other treatment prescribed to address her reported pain and fibromyalgia symptoms.  (Tr. 977-81.)  He also considered her reported activities of daily living, explaining:

> The undersigned finds that the claimant was more active and more capable than alleged. At a medical appointment on August 21, 2013, the claimant denied having difficulty performing or completing routine daily living activities[]. At medical appointments, despite reporting pain rated as high as 5/10 at times, the claimant consistently denied any serious difficulty concentrating, remembering, or making decisions; denied any serious difficulty with walking or climbing stairs; and she denied difficulty doing errands alone such as visiting a doctor's office or shopping (see July 17, 2014[]; August 12, 2014[]; August 18, 2014[]; October 27, 2014[]; November 24, 2014[]). In December 2014, the claimant told her primary care physician that she lived with her husband and their 10-year-old son. She reported that she cleaned and cooked []. When the claimant was living with Greg, the claimant reported that she was tired of "being his mother"—she helped Greg with his medications, prescriptions, and health concerns; she helped around the home and she attended appointments with Greg []. In November 2015, the claimant reported that she received great joy in taking care of her one-year-old granddaughter, Maggie[]. On May 11, 2016, the claimant saw Ms. Darby and the claimant was accompanied by her granddaughter Maggie[]. From all of this, the undersigned finds that the claimant's symptoms and limitations were not as severe as alleged.

(Tr. 984 (emphasis added) (citations omitted).)  He also considered and weighed the medical opinion evidence.  (Tr. 982, 984-86.)

A review of the entire ALJ decision demonstrates that he considered the entire record, based his findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.  He acknowledged Ms. Bowen's subjective allegations, but concluded that her "statements concerning the intensity, persistence and limiting effects of [the] symptoms [caused by her severe impairments] [were] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 976).

The Court finds that the ALJ sufficiently detailed his reasons for reaching his RFC determination and made a decision supported by substantial evidence.  He was not required to "accept [Ms. Bowen's] subjective complaints." *Jones*, 336 F.3d at 476.  The ALJ weighed the entirety of the evidence and credited Ms. Bowen's allegations regarding her fibromyalgia symptoms, including her allegations of pain, to the extent he found them supported by the record. While Ms. Bowen argues that the evidence supports a finding that her pain was more limiting than the ALJ found it be, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

The Court finds that the ALJ adequately considered Ms. Bowen's subjective allegations in the context of the record as a whole and made a decision supported by substantial evidence. Ms. Bowen has not met her burden to show that the ALJ erred in considering her subjective complaints of pain, and the Court finds that the ALJ adequately explained his reasons for finding the subjective complaints were not entirely consistent with other evidence in the record.

Additionally, the Court finds that the ALJ sufficiently explained and supported his RFC determination which accounted for both physical and mental limitations, including limitations to

sit for two hours at time, stand for one hour at a time, and stand or walk for a total of only five

hours in an eight-hour workday.  (Tr. 975-76.)   The ALJ explained that his RFC was:

> supported by the objective medical evidence, the clinical findings on examinations,
> the treatment records discussed above, the lack of treatment sought or pursued by
> the claimant, Dr. Duby's opinion, and part of the consultants' opinions at Exhibits
> 1A and 3A, all of which suggest greater sustained capacity than described by the
> claimant. The claimant's subjective complaints and alleged limitations are not fully
> persuasive and she retained the capacity to perform work activities with the
> limitations set forth above.

(Tr. 986-87.)  Even if a preponderance of evidence supported Ms. Bowen's argument that her

subjective allegations support greater RFC limitations, this Court could not overturn the

Commissioner's decision "so long as substantial evidence also support[ed] the conclusion

reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Having reviewed the

decision as a whole, the Court concludes that the ALJ sufficiently explained his RFC

determination and that the RFC determination has the support of substantial evidence.  Ms.

Bowen's second assignment of error is without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

October 5, 2023

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

52